(No. 17065.—Reversed and remanded.)
PHILIP D. KAPLAN, Defendant in Error, *vs.* ISAAC STEIN,
Plaintiff in Error.

*Opinion filed February 24, 1928—Rehearing denied April 4, 1928.*

1. PRACTICE—*when rule presuming omitted evidence sustained decree cannot be applied.* Where evidence or exhibits are omitted from the record a court of review will presume that there was sufficient evidence to sustain the decree, but where some of the exhibits were not offered, some offered but excluded by the master, and no error is assigned on any such ruling either in the trial or the Appellate Court and no objection is made to the certificate of evidence as signed by the chancellor, a party cannot insist for the first time in the Supreme Court that the Appellate Court should have applied the rule and presumed that certain evidence omitted from the record sustained the decree.

2. ACCOUNTING—*failure of defendant to produce receipts raises presumption that they would be adverse.* In an action for an accounting by a co-partner, failure of the defendant to produce receipts in accordance with the state of account as claimed by him raises the presumption that their production would be adverse to the defendant.

3. SAME—*when defendant partner is liable for interest.* The fact that a partner, who is defendant in a suit for an accounting, has property of the partnership in his hands does not necessarily make him liable for interest, where there has been no improper use of the partnership funds and no failure to account for the property or unreasonable delay in doing so; but whether a partner is to be charged with interest depends upon the circumstances of the case, and he is liable if he has improperly used or neglected to account for assets before the bill is filed, or if, after the bill is filed, he throws obstacles in the way of the accounting and induces the court to withhold the hearing longer than it otherwise would have done.

4. SAME—*when one partner should not be charged with interest from date of dissolution of partnership agreement.* Where a mercantile partnership agreement provides that either party may terminate the contract and that upon termination of the relation the goods on hand may be divided or sold, without specifying who is to sell them, the partner who retains possession and undertakes to sell the goods without delay should not be charged with interest during that time, but if, after the sale is completed, he fails and

refuses to account he should be charged with interest from the date of such default.

5. COSTS—*costs in chancery should be determined in accordance with the equities of the parties.* The payment of costs in chancery cases is largely within the discretion of the chancellor, but the discretion must be exercised in accordance with the equities of the parties.

WRIT OF ERROR to the First Division of the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

GOOD, CHILDS, BOBB & WESCOTT, (DWIGHT S. BOBB, and F. M. HARTMAN, of counsel,) for plaintiff in error.

ROBERT P. BURKHALTER, and EDWIN WHITE MOORE, for defendant in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

Defendant in error, Philip D. Kaplan, (herein referred to as complainant,) filed his bill in the superior court of Cook county against plaintiff in error, Isaac Stein, (herein referred to as defendant,) for an accounting. The cause was referred to a master to take the evidence and report whether complainant was entitled to an accounting. The master found that complainant was entitled to an accounting and a decree was entered accordingly. An appeal was prosecuted to the Appellate Court for the First District, where the decree was affirmed, and the cause was remanded to the trial court to state the account. The cause was referred to a master to take the evidence and report his conclusions. The master took the evidence but died before he made his report. The cause was referred to another master, and it was stipulated that the evidence taken before the first master should stand as the evidence in the case. The master

found that there was due from defendant $9261.87, less $950 which had been paid, leaving a balance of $8311.87, together with interest and costs. Defendant tendered the amount found due, but it was refused, and complainant prosecuted a writ of error from the Appellate Court for the First District. The decree was reversed and the cause remanded for further findings by the master. A petition for a rehearing was granted, and later the decree was reversed and the cause remanded with directions to enter a decree in favor of complainant for $32,342.74, together with interest from July 26, 1919, with costs against defendant. The cause is now before this court on a writ of *certiorari*.

Defendant was a clothing merchant in Chicago. Complainant was a merchandise broker, and their places of business were within a block of each other. On September 30, 1918, they entered into a written contract which recited that defendant was about to open a new department in his store to buy and sell silks and other dress goods and desired to employ complainant to manage the new department. It was agreed that complainant was to be employed to negotiate the purchase and sale of these goods, all of which were to be approved by defendant before they were to be binding upon him. Defendant was to pay complainant for his services one-half of the net profits. In determining the net profits no charges were to be made for rent or light or for the services or expenses of either party. The contract provided that the complainant's "share of the net profits shall equal ten per cent of the amount invested by the said Stein, and the said Kaplan shall only withdraw his share of the net profits in excess of ten per cent until the final termination of the contract." Ten per cent of complainant's profits was to be left in the business to secure defendant against loss, which was to be shared equally. Any interest paid by defendant on money borrowed was to be deducted from the profits. It was stipulated that the contract was a contract of hiring and not of partnership; that

either party might terminate the contract at will, and upon such termination all goods on hand were to be sold or divided, as the parties might agree, all outstanding accounts collected, all bills paid and the balance divided equally.

The new department was opened in the store of defendant under the name of Stein Textile Company. From September 30, 1918, to March 11, 1919, no book-keeper was employed, and the books which were kept were of little value in showing the business transacted. On January 11, 1919, the contract was modified by a writing which provided that complainant was to receive 40 per cent of the net profits and defendant was to receive 60 per cent. On March 1, 1919, the business was enlarged, it was moved into larger quarters, more rent was to be paid, $35,000 was borrowed to carry on the business, complainant moved a stock of goods belonging to him into the new quarters, he devoted his whole time to the business and was allowed a drawing account of $50 a week against his share of the profits. On March 11, 1919, a double-entry system of book-keeping was installed and a book-keeper was employed at $18 per week. In the latter part of May, 1919, difficulty arose between the parties, and on May 29, 1919, defendant notified complainant that he had decided to terminate the contract. No date was fixed for its termination. Defendant said the business would be continued until the goods on hand were sold. Complainant suggested that a division of the merchandise be made, but defendant would not agree to this. Complainant then suggested that the goods be sold on as short terms as possible, which was agreed to by defendant. Complainant repeatedly asked defendant for an accounting after this date. Defendant said he would wait until all goods were sold and they would then make a division of the profits. On one occasion defendant ordered complainant out of his office. On July 26, 1919, according to the defendant's testimony, he drove complainant away from the store, and on another occasion defendant had a policeman remove him

from the premises. After July 26, 1919, complainant had nothing to do with the business. Defendant had full charge, including the keeping of the books, to which complainant had no access. The sales were made by defendant and continued until November 30, 1919, when all of the goods were sold. After the bill for an accounting was filed each party employed an expert accountant to audit the books. Arthur E. Hall acted for defendant and Glen L. Grawols for complainant.

Upon the death of the first master it was stipulated not only that the evidence taken before the first master should stand as the evidence in the case, but it was also agreed that the reports of the auditors, the books, records, checks, bills and receipts filed with the first master should be subject to the examination and consideration of the second master for the purpose of stating the account; that these books and records should not be or become a part of the record or reported to the court. It is contended by defendant that under this stipulation the master in stating the account examined the books, reports and other records left with him, but that none of this evidence is contained in the certificate of evidence and was not before the Appellate Court; that therefore the Appellate Court could only affirm the decree, or reverse it and remand the cause for a new trial; that the presumption is that the evidence considered by the master and omitted from the certificate of evidence would sustain the decree.

The rule is well settled that where evidence or exhibits are omitted from the record a court of review will presume that there was sufficient evidence to sustain the decree. (*Kennard* v. *Curran,* 239 Ill. 122; *McKennan* v. *Mickelberry,* 242 id. 117; *People* v. *Niehoff,* 266 id. 103.) That rule, however, is not applicable to the facts now before us. The books, reports and other documents were not admitted in evidence. Some of them were offered but were not admitted. No error was assigned on any of these rul-

329—17

ings either in the trial court or in the Appellate Court. No objection was made to the certificate of evidence as signed by the chancellor and no suggestion was made in the Appellate Court of a diminution of the record. The first time a complaint was made in this regard was after the Appellate Court had reversed the decree with directions. As a matter of fact, it is admitted that the books from September 30 to March 11 were of no value in stating the account. The books from July 26 to November 30 were made under the direction of the defendant, with no opportunity to complainant to see or examine them, and for this reason they were not admissible as a record against complainant. The books from March 11, 1919, to July 26, 1919, contained very little controverted matter except as to sums paid out for expenses, and during a part of this period complainant was prevented from seeing them. If defendant wanted these various items of evidence in the record he should have made the offers and assigned error upon the rulings, which he did not do. For that reason he is in no position to take advantage of the situation for the first time in this court. The parties had the right to try their case as they saw fit, according to the rules of law. Almost 900 pages of evidence was taken, consisting of the testimony of the parties, of the accountants and of other witnesses. The accountants testified in great detail, without objection, as to the result of their audits and what the books showed. The cause was submitted on this evidence, and if it is sufficient to determine the account between the parties neither side has any ground to complain.

In stating the account the first question is to determine the profits from September 30, 1918, to March 11, 1919. It is conceded that this cannot be determined from the books kept during this period. The double-entry set of books opened on March 11, 1919, was installed by John M. Delson, an accountant who was a distant relative of defendant's wife. In the first pages of these books he made

memoranda in which he places the expenses at $931, the purchases at $9914.64, the sales at $11,471.19, the goods on hand March 11, 1919, at $12,479.58, and the profits at $573.60. None of these items are sustained by the preponderance of the evidence except as to the goods on hand. Complainant testified that the expenses from September 30, 1918, to January 11, 1919, did not exceed $50, and from January 11, 1919, to March 11, 1919, they were $300. There is no evidence of any other items of expense. There was no expense for rent or light, no book-keeper was employed until March 1, and complainant did most of the work. Evidence was offered by defendant that on March 11, 1919, complainant agreed that the profits up to that date were only $573.60. This contention is not sustained by the evidence. The preponderance of the evidence shows that complainant was in New York on March 11, 1919, when the new books were opened and when the alleged agreement was made, and that he was not present at the time Delson testified he agreed to $573.60 as profits. The preponderance of the evidence not only shows that such an agreement was not made, but the undisputed facts in evidence are contrary to such a conclusion. On March 11 the business had been in operation almost six months. If the profits during this period had only been $573.60, such profits would not have justified the new financial obligations which were incurred during that time. The undisputed evidence is that during that period the business was enlarged, it was moved into larger and more commodious quarters, more rent was to be paid, a double-entry set of books was opened, a book-keeper was employed at $18 per week, $35,000 was borrowed to carry on the business, complainant moved his own stock of goods into the new quarters, devoted his entire time to the new business and was allowed to draw $50 per week against his share of the profits. In the face of all these undisputed facts defendant contends that complainant agreed that the profits for this

period were only $573.60, and Delson so entered that agreement on the books. Complainant testified, without contradiction, that from September 30, 1918, to January 11, 1919, about $10,000 worth of goods were purchased; that about 95 per cent of these goods were sold at 20 per cent profit, with a total expense of not to exceed $50; that from January 11, 1919, to March 11, 1919, $45,000 worth of goods were bought and the expenses were not to exceed $300. We think complainant is sustained in these figures by other facts in evidence. For example, defendant testified that complainant in January, 1919, went to New York and purchased $20,000 to $25,000 worth of goods, and that he and complainant went to New York in February, 1919, and bought $20,000, $25,000 or $30,000 worth of goods. If all these goods were purchased as testified by defendant and $35,000 was borrowed to carry on the business, it is apparent that the profits were more than $573.60 up to March · 11, 1919.

Placing the purchases from September 30, 1918, to January 11, 1919, at $10,000, the sales at $9500, the expenses at $50, the profits at 20 per cent, and dividing the profits equally, the share of each partner for this period would be $925, as found by the Appellate Court. This finding is sustained by the preponderance of the evidence. From January 11, 1919, to March 11, 1919, the evidence shows $45,000 worth of goods were purchased, that $500 worth of goods were left on hand from the prior purchases, the expenses were $300, and the goods on hand on March 11, 1919, were worth $12,479.58. This leaves $33,020.42 as the value of the goods sold at 20 per cent, less $300 for expenses, or a net profit of $6304.08, of which 40 per cent, or $2521.63, was the share of complainant. This amount added to the $925 from September 30, 1918, to January 11, 1919, made a total profit of $3446.63 due complainant from September 30, 1918, to March 11, 1919, instead of $3502.68 as found by the Appellate Court. The master found the

profits for this period to be 40 per cent of $573.60, or $229.40.

As to the profits from March 11, 1919, to November 30, 1919, defendant filed with the master his account in which he admitted sales of $182,118.32, less the inventory of March 11, 1919, amounting to $12,479.58, and purchases of $139,232.88, leaving a balance of $30,405.86. To this he added $4091.19 as the inventory of goods which should have been on hand on November 30, 1919, as shown by the report of the auditors, together with $300 profit on a purchase contract, making $34,797.05 as the gross profits. From this he deducted $14,756.65 for expenses, leaving net profits of $20,040.40, complainant's share being 40 per cent, or $8016.16. The master for the same period found that the gross profits were $30,705.86 and the expenses $8124.77, leaving a net profit of $22,581.09. Forty per cent of this, or $9032.43, belonged to complainant.

In estimating the profits from March 11, 1919, to November 30, 1919, the Appellate Court divided the time into two periods, the first one being from March 11, 1919, to July 26, 1919, the date defendant took exclusive possession of the goods; and the second one from July 26, 1919, to November 30, 1919. The Appellate Court found that from March 11, 1919, to July 26, 1919, the gross sales were $162,696.20 and the purchases $140,193, leaving $22,503.20 as the gross profits, from which $3559.29 was deducted for expenses, leaving $18,943.91 as the net profits, of which complainant was entitled to 40 per cent, or $7577.56. These figures were based upon the audit of Grawols. Complainant testified that on July 26, 1919, when he was excluded from the store, there were $35,000 worth of goods on hand. Defendant testified that on July 26, 1919, there were between $30,000 and $35,000 worth of goods on hand. By November 30, 1919, all of the goods were sold. Grawols testified that the average profits from March 11, 1919, to November 30, 1919, as determined by his auditor, were

21½ per cent. The Appellate Court found that 21½ per cent of $35,000 (the value of the goods on hand) was $7525, the amount of the profits, and that complainant was entitled to 50 per cent of this, or $3762.50. We think the Appellate Court was in error in dividing the profits equally, for the reason that under the contract of January 11, 1919, complainant was only entitled to 40 per cent of the profits, or $3010.

From an analysis of these figures, based on the statement filed by defendant with the master, the master's report and the finding of the Appellate Court, it is apparent that the difference in the amount of profits found due complainant from March 11, 1919, to November 30, 1919, in these different calculations is due to the difference in the expenses allowed. There is a difference of only $677.66 between the gross profits found by the master and the amount found by the Appellate Court. There is a difference of $4768.85 between the schedule of gross profits filed by the defendant with the master and the amount found by the Appellate Court. The defendant admitted $4768.85 more gross profits than the Appellate Court found were due.

Attached to the schedule filed by defendant with the master is a list of expenses charged, totaling $14,576.65. Included in this schedule is $1700 for services to Gurwit, a son-in-law of defendant. The evidence shows that Gurwit did not perform any services in the store under this contract and therefore was not entitled to any compensation, and both the master and the Appellate Court so found. Two thousand dollars was charged by defendant for his own services after July 26, 1919, and $1966.50 was charged for rent. Neither of these items, under the terms of the contract, was chargeable against complainant and both were properly rejected by the master and by the Appellate Court, making a total of $5666.50, which without question should be deducted from the $14,576.65 as claimed by defendant.

Defendant in his schedule of expenses claimed $3478 for labor, but the master only allowed $812.70 of this amount.

The book-keeper from March 11, 1919, to November 30, 1919, testified that she paid all bills by check and took receipts for all money paid out by her; that at the end of each month these receipts were placed in separate files and all of them were in the office when she quit work in March, 1920. On the trial defendant produced most of the checks used in paying these bills. He produced a few of the receipts and testified that he had no idea what became of the balance. Grawols testified that in his audit he found very few receipts. He did find some checks, but he did not consider that any item should be allowed as expenses unless there was a receipt and check for it. The account as filed by defendant not only contained $5666.50 for expenses for which he was not entitled to credit, but, in addition to this, one of the clerks employed in the clothing department of defendant's store testified that defendant requested him to testify that the witness was not working in the clothing deparment of defendant's store but was working for the Stein Textile Company so that the salary of the witness could be charged to the textile company, and it was so charged. The evidence also shows that in September, 1919, William Goldrich purchased goods of the value of $1245.86 and Isadore Doctor made purchases of $1550.47, neither of which sales appeared upon the books. Grawols testified that he was unable to find sufficient sales to account for the purchases made, which left goods not accounted for. It is apparent from all of this evidence that the books did not state a true and correct account of all receipts and expenses. They could not be relied upon in stating the account, and for that reason the items of expense claimed by defendant and filed with the master should be scrutinized with care and only such items should be allowed as were clearly established by the evidence.

In Bates on Partnership (vol. 2, sec. 983,) it is said: "So where a partner whose duty it was to keep 'the books claims to be entitled to credit and to have made payments which are omitted from the books, he must lose them unless he can make most satisfactory proof. No claim in his favor will be established on mere probabilities, but every reasonable presumption will be made against him." In 22 Am. & Eng. Ency. of Law, p. 127, it was said: "If books are kept in such manner as to be unintelligible, or if they are destroyed or wrongfully withheld, and an accounting is directed by the court, every presumption will be made against those to whose negligence or misconduct the non-production of proper accounts is due." In 20 R. C. L. (sec. 153, p. 934,) it is said: "Partnership books are admissible in evidence for the purpose of showing the state of the partnership affairs, even when the entries are made by one partner alone, provided that the co-partners have access to the books and an opportunity to object to the entries in question." Under these authorities the failure of defendant to produce the receipts raised the presumption that their production would be adverse to defendant. *Rector* v. *Rector,* 3 Gilm. 105; *Cartier* v. *Troy Lumber Co.* 138 Ill. 533; *Mantonya* v. *Reilly,* 184 id. 183.

If from the gross profits of $34,797.05 as stated by defendant in his schedule filed with the master, $8124.77 of expenses as allowed by the master are deducted and the balance is figured at 40 per cent, the profits due complainant from March 11, 1919, to November 30, 1919, would be $10,668.91 as against $11,340.06 found by the Appellate Court and $10,587.56 found due by this court. It is impossible to determine with absolute accuracy the amount due complainant from March 11, 1919, to November 30, 1919, but after a careful consideration of all the evidence we are of the opinion that the profits due complainant from March 11, 1919, to July 26, 1919, were $7577.56, and that the profits due from July 26, 1919, to November 30, 1919,

were $3010, making a total of $10,587.56 from March 11, 1919, to November 30, 1919.

In addition to the $3010 found due complainant as profits from July 26, 1919, to November 30, 1919, the Appellate Court found that complainant was entitled to $17,500, being one-half of the $35,000 worth of goods on hand on July 26, 1919, when defendant assumed exclusive charge of the business. In this finding we think the court was in error. The preponderance of the evidence shows that the value of the stock on July 26, 1919, was $35,000, $4554.56 in cash was in the bank and there were $38,000 of accounts on the books, practically all of which were subsequently collected by defendant. The evidence also shows that $36,000 was owing for money borrowed, which defendant paid after July 26. It is the contention of complainant that the accounts receivable and cash, amounting to $42,554.50, were more than enough to pay the $36,000 of money borrowed, and therefore he was entitled to one-half of the value of the goods on hand in addition to profits made on their sale. This contention is not correct. The account as stated covered all of the business transactions of every kind and character, including goods bought and goods sold, whether for cash or on account. The profits were determined by deducting from the total sales the cost of the goods and the expenses, and complainant was given credit for his share of the profits. All of these items were computed on a cash basis. The contract provided that upon the termination of the contract all stock on hand should be sold or divided, as the parties might agree, all outstanding accounts collected, all bills and liabilities paid, and the balance, if any, equally divided. This $36,000 of borrowed money did not represent an asset of the business but it was a liability. It had been borrowed and used for the purpose of increasing the working capital and for its use interest had been paid. The profits of complainant had been increased by its use. Its use was taken into account in esti-

mating the profits but it should not have been taken into consideration in determining the capital. The profits had not only been estimated on a cash basis but all of these profits in the estimate had been charged to defendant. He was therefore charged with the cash in the bank and the accounts receivable considered as cash. If he was charged with these amounts as cash and had to account to complainant for complainant's share of them, it certainly cannot be said that they should be used in paying the $36,000 of borrowed money so as to divide the $35,000 worth of goods between the parties. On July 26, 1919, the parties had $35,000 worth of goods on hand, but they did not own $35,000 worth of goods on that date to be divided equally. They, in fact, owned no goods at that time for the reason that they owed $36,000 on those goods, or they owed it on their individual credit. Complainant was not entitled to one-half of the $35,000, and it should not have been included in the award.

The Appellate Court held that defendant was chargeable with interest from July 26, 1919, and that he should pay all of the costs. Whether a partner is to be charged with interest depends upon the circumstances of each case. The fact that he has property of the partnership in his hands does not necessarily make him liable for interest where there has been no improper use of the partnership funds, no failure to account for the property or unreasonable delay in doing so. (*Parish* v. *Bainum*, 306 Ill. 618.) He is liable for interest if he has improperly used or neglected to account for the assets of the partnership before the bill for an accounting is filed. He is also liable for interest after the bill is filed if he throws obstacles in the way of the accounting and induces the court to withhold the hearing longer than it otherwise would have done. (*Snell* v. *Taylor*, 182 Ill. 473; *Imperial Hotel Co.* v. *Claflin Co.* 175 id. 119; *Randolph* v. *Inman*, 172 id. 575; *Brownell* v. *Steere*, 128 id. 209.) The payment of costs in chancery

cases is largely within the discretion of the chancellor, but the discretion must be exercised in accordance with the equities of the parties. (*First Nat. Bank of Chrisman* v. *Watson*, 277 Ill. 186.) In *Keller* v. *Bading*, 169 Ill. 152, it was said: "The claim asserted by appellants to this fund rendered the filing of this bill necessary on the part of appellees. Appellants did not disclaim but by their demurrer denied the right to relief. They were actively contesting the right of appellees to have a decree, and the costs were properly awarded against them."

Upon the termination of the contract the parties by agreement had the right to divide the stock on hand or to sell it. How it should be sold or who should sell it was not specified. Defendant saw fit to take this burden upon himself. He sold it in about 100 days from the time he took exclusive possession. There is no evidence of unreasonable delay in making the sale. If he acted without delay in this respect he should not be charged with interest during that time. After the sale was completed he failed and refused to account, and he should be charged with interest from the date of that default, which was November 30, 1919. To the bill defendant filed an answer, in which he alleged that the contract was terminated on March 25, 1919, by mutual agreement, and that complainant was not entitled to an accounting. There was a hearing on this question and 500 pages of evidence was taken. There was a finding against defendant, an appeal was prosecuted and the decree was affirmed. A long and costly litigation followed, resulting in a decree against defendant. On appeal it was held by the Appellate Court, and is now held by this court, that the amount awarded complainant by the trial court was not in full of what he was entitled to receive. Under these facts we think all of the costs should be charged against defendant.

Complainant's share of the profits is as follows: From September 30, 1918, to January 11, 1919, $925; from Jan-

uary 11, 1919, to March 11, 1919, $2521.63; from March 11, 1919, to July 26, 1919, $7577.56; from July 26, 1919, to November 30, 1919, $3010; making a total profit of $14,034.19. From this should be deducted nineteen payments on weekly account of $50 each, or $950, leaving a balance due complainant of $13,084.19, together with interest from November 30, 1919, and costs.

The decrees of the Appellate Court and of the superior court will be reversed and the cause remanded to the superior court, with directions to enter a decree according to the above findings.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*